UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Barbara Kappenman, and BARBARA KAPPENMAN, individually, | ) ) ) ) ) | CIV.  09-4039-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| COMPASSIONATE CARE HOSPICE OF THE MIDWEST, L.L.C., | ) ) ) | |
| Defendant. | ) | |

Defendant, Compassionate Care Hospice of the Midwest, L.L.C. (CCH),

moves for summary judgment and alleges that plaintiff United States of

America, *ex rel.* Barbara Kappenman cannot maintain a cause of action under

the False Claims Act (FCA) when the conduct consists of regulatory

noncompliance. Docket 40. CCH also alleges that it is entitled to summary

judgment on plaintiff Barbara Kappenman's retaliation and state-law claims.

Kappenman[1] resists the motion. Docket 45. For the following reasons,

summary judgment is granted on the § 3729(3) claim under the FCA, the

intentional infliction of emotional distress claim, and the tortious interference

with a business relationship claim. The motion is denied in all other respects.

_____

[1] Plaintiffs, United States of America *ex rel.* Barbara Kappenman and
Barbara Kappenman, individually, will be collectively referred to as
Kappenman.

**BACKGROUND**

Viewing the facts in a light most favorable to Kappenman, the nonmoving party, the record establishes that CCH is an entity that offers hospice services to the terminally ill in South Dakota. CCH is licensed and certified as a participant in federal health care programs, including Medicare. Kappenman was an employee of CCH from 2007 to 2008 as a case manager and eventually as a patient quality of care coordinator. Docket 41 at 3. Her duties in 2008 included reviewing and auditing patient medical files to assist coordination of care activities, and to assess documentation of hospice eligibility depending on the specific Medicare regulations. *Id.* While doing routine audits, Kappenman found a number of regulatory concerns in patient charts that she brought to the attention of her direct supervisor in South Dakota, Julie Phillips. Kappenman specifically identified at least three patient files uncovered during the course of her employment that she believed had insufficient documentation to show that the patients were eligible for Medicare services.

Kappenman reported her discoveries to other CCH employees. After determining that CCH employees in the Sioux Falls office were not taking the matter seriously, Kappenman prepared a letter of her concerns and eventually traveled to CCH corporate headquarters in New Jersey. In December of 2008, Kappenman met with two of CCH's corporate officers and relayed her findings.

2

When she returned to Sioux Falls, she found the office to be in chaos. Phillips had moved her desk into the corner of a different room, had removed her computer and phone, and held a private staff meeting that excluded Kappenman. On January 9, 2009, Kappenman was terminated from CCH. Docket 42 ¶ 11. Kappenman's termination followed a tumultuous exchange of text, email, and phone messages between many CCH employees about the current work situation at CCH.

In February of 2009, Kappenman began working for a competitor of CCH, Asera Care, and she earned approximately $20,000 more in this new job than she had at CCH. Following Kappenman's termination, CCH believed that Kappenman was making defamatory statements about CCH and discussing her alleged fraudulent findings with other people. Through its attorney, CCH sent a letter to Kappenman and her new employer and requested that Kappenman cease and desist making any defamatory comments about CCH. Docket 41 at 5.

On April 2, 2009, Kappenman brought this action as a relator under the *qui tam* provision of the False Claims Act to recover treble damages and penalties that arose from a series of false claims made by CCH to the government through Centers for Medicare & Medicaid Services (CMS). Docket 1. Kappenman also brought state-law claims in her personal capacity that stem from her discharge from CCH. The United States chose not to intervene

3

and filed a Notice of Declination in September of 2009. Docket 8. Kappenman now proceeds on behalf of the United States for the FCA liability and on her own behalf on the state-law claims.

## STANDARD OF REVIEW

Summary judgment is appropriate in a case where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A mere factual dispute does not prevent summary judgment, rather, only if there is a genuine issue of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Whether a fact is material depends on the substantive law of the case and whether that fact's resolution affects the outcome. *Anderson*, 477 U.S. at 248. The facts are viewed in the light most favorable to the nonmoving party and all reasonable inferences are drawn in his or her favor. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party " 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 248. "The court should deny summary judgment if there is sufficient evidence for a jury to return a verdict for the non-moving

party." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 911 (8th Cir. 2011) (citation omitted).

While this case is before the court under the False Claims Act, South Dakota substantive law applies to the ancillary state-law claims involving wrongful termination, intentional infliction of emotional distress, wrongful discharge, defamation, tortious interference with a business relationship, and punitive damages because those causes of action arise under South Dakota law. *See Witzman v. Gross*, 148 F.3d 988, 990 (8th Cir. 1998) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

## DISCUSSION

## I.     False Claims Act

"Congress enacted the FCA to protect government funds and property from fraudulent claims." *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir. 1998) (citation omitted). The Supreme Court stated that "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). An FCA cause of action may be brought by either the government or by a person who brings a *qui tam* action on behalf of the government. 31 U.S.C. § 3730.

Congress amended the FCA in May of 2009 when it enacted the Fraud Enforcement and Recovery Act of 2009 (FERA). *United States ex rel. Vigil v.*

5

*Nelnet, Inc.*, 639 F.3d 791, 796 n.4 (8th Cir. 2011); *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 303 (3d Cir. 2011) (citing Pub. L. No. 111-21, 123 Stat. 1617 (2009)). Specifically, FERA amended certain language in the statute and redesignated 31 U.S.C. § 3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) as 31 U.S.C. § 3729(a)(1)(B). *Wilkins*, 659 F.3d at 303. Although this cause of action was filed prior to the enactment of FERA, there is a retroactivity provision that specifically applies the amended § 3729(a)(1)(B) retroactively to all claims that were pending on or after June 7, 2008. *Id.* at 303-04. Because this claim was filed in April of 2009, the court will assume without deciding that the pre-FERA law applies to this claim except when applying § 3729(a)(1)(B). *Id.* Regardless, the court finds that the result on summary judgment would be the same under either the FCA or FERA.

"Liability for a violation of § 3729(a)(1) requires proof that a materially false or fraudulent claim was 'presented' to the Government." *Vigil*, 639 F.3d at 797 (citation omitted). For a claim under § 3729(a)(1)(B), liability is imposed upon "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" The word "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). To make out a prima facie case under the FCA, a litigant must

6

show: "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002) (citation omitted).

### A.      Claim Against the Government

Kappenman claims that CCH presented false claims to the government by providing hospice services to ineligible patients and then knowingly submitting false claims for reimbursement. CCH asserts that Kappenman only alleges regulatory noncompliance issues and cannot show that the alleged regulatory violations are conditions of government payment or point to any specific claim that was submitted falsely. Kappenman disagrees and alleges that because CCH's regulatory noncompliance directly relates to reimbursements to CCH from Medicare, there is a causal link between CCH's failure to report ineligibility and the government's payment.

"Claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property" that is presented to the government. 31 U.S.C. § 3729(c). The sort of claim at issue in this case is reimbursements to CCH from Medicare for hospice services provided to eligible Medicare[2]

_____

[2] Medicare provides federal health insurance for the elderly and disabled. *See* 42 U.S.C. § 1395 *et seq.* Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), which is a division of the Department of Health and Human Services (HHS). *United States ex rel. Sarasola v. Aetna Life Ins. Co.*, 319 F.3d 1292, 1293 (11th Cir. 2003). Medicare Part A offers benefits

beneficiaries. Hospice care is a type of care given to those who are terminally ill. To be eligible for hospice care under Medicare, the beneficiary must be both entitled to Part A coverage under Medicare and have been certified as "terminally ill" by his or her physician. 42 C.F.R. § 418.20; 42 C.F.R. § 418.22. CCH provides hospice care to eligible patients in exchange for payments from Medicare by submitting these claims for reimbursement to CMS. Docket 1 ¶ 6. Under the Medicare statute, however, there can be no payments made to providers for services or items "in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness[.]" 42 U.S.C. § 1395y(a)(1)(C).

The Eighth Circuit Court of Appeals has noted that "[t]he FCA is not concerned with regulatory noncompliance. Rather, it serves a more specific function, protecting the federal fisc by imposing severe penalties on those whose false or fraudulent claims cause the government to pay money." *Vigil*, 639 F.3d at 795-96. FCA claims are not meant to "encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). There must be a connection between the regulatory noncompliance and the

for "hospital, related post-hospital, home health services, and hospice care." *Id.* (citing § 1395c). Those health care providers who participate in Medicare programs enter into a provider agreement with the Secretary of HHS and then the provider "is reimbursed directly for the reasonable cost of services provided to Medicare patients." *Id.*

government's decision to pay funds. *See McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe.").

Generally, there are two types of false claims, those that are factually false and those that are legally false:

> A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment. A legally false FCA claim is based on a "false certification" theory of liability.

*Wilkins*, 659 F.3d at 305. There are both express and implied false certifications. *Id.* Express false certifications occur when "an entity is liable . . . for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *Id.* (citation omitted). An implied false certification[3]

---

[3] Although the Eighth Circuit Court of Appeals has not decided this issue, the majority of the courts of appeals that have considered whether there may be an implied false certification liability action under the FCA have recognized that this type of claim exists. *Wilkins*, 659 F.3d at 306 (citing *Mikes*, 274 F.3d at 699-700; *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 996-98 (9th Cir. 2010); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217-18 (10th Cir. 2008); *McNutt*, 423

9

is "when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Id. See also United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("Courts infer implied certifications from silence 'where certification was a prerequisite to the government action sought.' ").

Though the implied false certification claim does not fit comfortably into the health care field because the FCA was not intended to be used to enforce compliance with medical regulations, it can be applied in the proper instances. *Wilkins*, 659 F.3d at 307. Under this theory, the relator "must show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." *Id.* (citing *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1219-20 (10th Cir. 2008)). Implied false certification claims are conditions of payment claims, which contrast with conditions of participation claims. *Conner*, 543 F.3d at 1220 (citation omitted). Conditions of participation claims are not actionable FCA claims and "are enforced through administrative mechanisms, and the

---

F.3d at 1259; *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266, 1269 (D.C. Cir. 2010)).

ultimate sanction for violation of such conditions is removal from the government program." *Id.*

The Medicare statute specifically requires that "no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. § 1395y(a)(1)(C). This section is an express condition of payment that links "each Medicare *payment* to the requirement that the particular item or service be 'reasonable and necessary.' " *Mikes*, 274 F.3d at 700. Stella Hardy, CCH's compliance director, admitted that viewing at least one specific patient file, M.H., she would have concluded that the patient may not have been eligible for hospice participation at some point during his coverage. Docket 46-9 at 7-9. Hardy stated that Kappenman's eligibility concerns were reasonable because the paperwork may not have supported eligibility. CCH also has acknowledged that it receives reimbursement from the federal government through Medicare and its intermediary CMS.

If patients like M.H. are ineligible for hospice care, then any services given to ineligible patients are not reasonable and necessary to their care and the condition of payment was not met by CCH. There is sufficient factual support for a jury to conclude that CCH failed to comply with a condition of payment, the condition was directly related to the payment of government

11

funds, and CCH submitted claims that were reimbursed. This creates a genuine issue of material fact as to whether a fraudulent claim was presented to the government or whether CCH made a false record or statement material to a false or fraudulent claim in violation of the FCA. Viewing the facts in the light most favorable to Kappenman, there is sufficient evidence to show CCH made a claim against the government.

**B.     The Claim Was False or Fraudulent**

There is a distinction in a False Claims Act claim between what constitutes a mistake and what amounts to fraud against the government. *See Quirk*, 278 F.3d at 767 (noting that innocent mistakes and negligence are not actionable under the False Claims Act). A false or fraudulent claim amounts to a lie to the government. *Id.* (citing *Hindo v. Univ. of Health Sciences/The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995)).

Kappenman claims that with at least one patient, M.H., that the information in the patient's chart lacked specific evidence to support his eligibility under Medicare. Docket 45 at 4. Hardy admitted that M.H. may have been denied admission for coverage for a portion of his time spent with CCH because the documentation in his chart was insufficient to prove eligibility. Docket 46-9 at 8-9. Hardy testified that the reason she never notified Medicare of M.H.'s potential ineligible status was because "The review was my opinion.

He had been certified by his attending physician and the medical director for his terminal illness." Docket 46-9 at 9-10.

The court has already found that there is a dispute of material fact about whether CCH patients were eligible for hospice care and Medicare benefits. Because that dispute exists and CCH was reimbursed for services provided for these potentially ineligible patients, then each submission for reimbursement could constitute a false or fraudulent claim and would be a lie that induced government payment.

### C.     CCH Knew the Claim Was False or Fraudulent

CCH alleges that even if the first two elements are satisfied, Kappenman cannot show any intent or knowledge by CCH that it or its agents intended to submit false claims to the government.

The False Claims Act defines "knowingly" as meaning that a person with respect to information:

    (1)    has actual knowledge of the information;

    (2)    acts in deliberate ignorance of the truth or falsity of the information; or

    (3)    acts in reckless disregard of the truth or falsity of the information.

*Quirk*, 278 F.3d at 767 (citing 31 U.S.C. § 3729(b)).

There is evidence in the record that numerous CCH employees, supervisors, and corporate officers knew of Kappenman's allegations and did not act quickly or did not act at all in response to her allegations. CCH admits

13

that it knew about Kappenman's claims, took them seriously, and investigated to see if there was any merit to the claims. From an outside perspective, however, things seemed to be unraveling at CCH immediately prior to Kappenman's termination. Upon Kappenman's return from New Jersey, Kappenman was told that her job was to collect data only and she "was not to provide staff with any guidance, education, or speak to them if they approached [her]." Docket 46-7 at 30. Kappenman was also told that her job description was being revised by the corporate office. Following that day, Kappenman was to give her supervisors a list of charts that needed to be audited, but Kappenman was no longer to audit the charts. *Id.* This evidence does not suggest that CCH was attempting to find and discontinue any fraudulent activity, but instead was trying to silence Kappenman.

A reasonable jury could view this evidence and conclude that CHS was acting in deliberate ignorance of the truth or acting with a reckless disregard of the alleged fraudulent claims by removing Kappenman from her auditing role. This evidence raises issues of material fact as to whether CCH knowingly submitted false or fraudulent claims to the government for repayment, and summary judgment is inappropriate. *See Vette Co.*, 612 F.2d at 1077 (stating summary judgment "is an extreme and treacherous remedy, not to be entered unless the movant has established its right to a judgment with such clarity as

to leave no room for controversy unless the other party is not entitled to recover under any discernible circumstances.").

Kappenman also alleges that CCH conspired to defraud the government by getting a false or fraudulent claim paid under § 3729(a)(3). CCH argues that Kappenman's claim of conspiracy under the False Claims Act fails because Kappenman did not name the alleged conspirators and a company cannot conspire with itself. The Eighth Circuit Court of Appeals has stated that a corporation cannot conspire with itself. *Cross v. Gen. Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir. 1983) (citation omitted). Kappenman did not respond to this argument, did not name any co-conspirators, and brought forth no material facts to support her claim. Therefore, summary judgment is granted on the conspiracy claim. *See Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' ").

## II.   Retaliation Under the FCA

The whistle blower statute within the FCA protects employees who have been " 'discharged . . . because of lawful acts done by the employee . . . in furtherance of [a civil action for false claims].' " *Schuhardt v. Wash. Univ.*, 390 F.3d 563, 566 (8th Cir. 2004) (citing 31 U.S.C. § 3730(h); *Wilkins v. St. Louis*

*Hous. Auth.*, 314 F.3d 927, 932-33 (8th Cir. 2002)). To prove retaliation, the employee must show:

(1)     the plaintiff was engaged in conduct protected by the FCA;

(2)     the plaintiff's employer knew that the plaintiff engaged in the protected activity;

(3)     the employer retaliated against the plaintiff; and

(4)     the retaliation was motivated solely by the plaintiff's protected activity.

*Id.* "The FCA whistle blower statute entitles an employee to all relief necessary to make that employee whole if she is discharged" or harassed "because of lawful acts done by the employee" to stop FCA violations. *Mahony v. Universal Pediatric Servs., Inc.*, 753 F. Supp. 2d 839, 846 (S.D. Iowa 2010) (citing 31 U.S.C. § 3730(h)(1)).

###     A.     Protected Activity

CCH argues that Kappenman did not engage in protected activity because she merely alleged regulatory noncompliance not linked to fraud, and her motivation for investigating the alleged fraud was not for the purpose of bringing an FCA claim. Docket 47 at 3-6. CCH also claims that unlike the relator in *Schuhardt*, Kappenman's conduct does not fit within the scope of protected activity because her review of patient charts was within her employment duties to ensure that CCH abided by Medicare regulations. Docket 41 at 14.

Protected activity is proven if the employee's actions satisfy two elements, "the employee's conduct must have been in furtherance of an FCA action" and "the employee's conduct must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action." *Schuhardt,* 390 F.3d at 567 (citations omitted). An employee also must show she engaged "in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Id.* at 567. An employee is not required to have filed an FCA lawsuit or to have developed the claim to prove he or she was engaging in protected activity. *Id.* (citations omitted).

Kappenman was required to review patient medical files in her position as a quality of care coordinator. There is no indication that Kappenman was employed to discover and investigate fraud. During the course of her routine patient chart audits, Kappenman identified a number of regulatory issues as it related to patients and their hospice eligibility. Kappenman testified that she believed these patients were wrongfully receiving Medicare benefits. She reported these concerns to her direct supervisor in South Dakota, Julie Phillips. Kappenman also traveled to CCH corporate headquarters in New Jersey and relayed these concerns in person. Docket 42 ¶ 5. Finally, Kappenman made her own independent notes from patient charts as to why

17

each patient was ineligible for Medicare services to prove her claims. This activity was not part of her employment with CCH. Like the employee in *Schuhardt*, because Kappenman went above and beyond her job description or duties, those actions were likely in furtherance of an FCA action. *Schuhardt*, 390 F.3d at 567 (noting that employee's activity of taking home files to copy them and substantiate the existence of fraud was not within her job duties and concluding the activity was in furtherance of an FCA action).

The evidence is sufficient to create a genuine dispute in material fact as to whether Kappenman's conduct was in furtherance of an FCA action or aimed at matters that could reasonably lead to a viable FCA action. Kappenman made a prima facie showing that she had a good faith belief and a reasonable employee in a similar position would conclude that CCH was possibly committing fraud against the government. These factual determinations on whether Kappenman's conduct was protected activity are for a jury to decide and are inappropriate for the court to determine on a summary judgment motion.

### B. Employer Knowledge

"A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000) (citation omitted). The employee must put on enough evidence to show that

the employer had notice that "plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Schuhardt*, 390 F.3d at 568 (citation omitted).

Kappenman can satisfy this element because CCH has admitted that Kappenman reported her allegedly fraudulent findings to numerous employees and supervisors, including corporate headquarters. Docket 42 at 2-3. Kappenman told Hardy at CCH corporate that she believed she was reporting illegal behavior, and that ineligible patients were being served. Docket 45 at 7. Moreover, CHS has admitted freely that it took Kappenman's claims seriously and implemented changes as a result. Docket 41 at 4. This evidence is sufficient for a reasonable jury to conclude that CCH had direct knowledge that Kappenman was engaging in protected activity.

CCH alleges that because finding and communicating Medicare deficiencies was part of Kappenman's duties at CCH, the reporting of these findings by Kappenman would not alert CCH that Kappenman was engaging in protected conduct because she was just doing her job. Docket 41 at 14. Kappenman responds that she was not employed to investigate fraud and that her duties "involved contact with patient charts, data entry, and documentation review, but did not entail investigation." Docket 45 at 7. Kappenman, however, has also alleged that she "is an expert in Medicare billing for hospice care." Docket 44 at 4. This evidence, along with the evidence

already discussed, creates a genuine dispute of material fact that precludes summary judgment on whether CCH had notice or knowledge of Kappenman's protected activity.

### C.      Employer Retaliation and Pretext

To avoid summary judgment, Kappenman must make a prima facie showing that CCH retaliated against her by subjecting her to a materially adverse employment action due to her protected activity, and it was the sole motivation for her termination. Kappenman was fired shortly after her trip to the corporate office in New Jersey. This discharge is an adverse employment action. CCH claims that it had a legitimate reason for terminating Kappenman and that she cannot show that her protected activity was the sole motivation for her termination. Docket 41 at 15.

CCH claims that Kappenman was terminated because she was insubordinate. CCH's chief operating officer, Judith Grey, contacted Kappenman after her return from New Jersey and asked her not to contact other employees about the "HR problems and any other problems that may be going on in the office." Docket 43-3 at 6. Grey said to Kappenman, "I'm asking you do not contact the employees any more, because at this point the employees feel that you're harassing them by contacting them so much[.]" Grey also said if Kappenman contacted other employees again that there would be consequences. *Id.* Grey stated Kappenman continued to contact CCH

20

employees and was fired for insubordination. There is evidence from Kappenman's co-workers that they did not feel harassed by her. Docket 44 ¶ 10.

Kappenman alleges that she was terminated because she reported the Medicare reimbursement issues and that any other reason given by CCH is pretextual. Kappenman notes that she was terminated immediately after her return from New Jersey and her contact with the corporate office. The timing of Kappenman's termination is suspect. Immediately upon Kappenman's return from New Jersey, Julie Phillips moved Kappenman's desk to the corner of another room and removed her telephone and computer. Docket 46-7 at 29. Kappenman then met with Phillips and Laurie Rahn. Kappenman was told that her job was to collect data only and she "was not to provide staff with any guidance, education, or speak to them if they approached [her]." Docket 46-7 at 30. Kappenman's job description also was being revised by the corporate office. There were closed-door meetings that Kappenman was not a part of, but Kappenman stated that she could hear her name being said in these closed-door meetings. *Id.* at 30-31.

The court finds there is sufficient evidence to show a genuine dispute in material fact whether Kappenman's whistle blowing was the actual and sole cause of her adverse employment action. There are also a number of issues of fact that must be decided by the jury on the question of whether CCH would

21

have terminated Kappenman even if she had not been engaged in protected activity in furtherance of an FCA claim. Thus, summary judgment is denied on Kappenman's FCA claim.

## III.    State-Law Claims

### A.    Wrongful Termination

South Dakota is an employment at-will state, and an employee can be terminated with or without cause. SDCL 60-4-4; *Anderson v. First Century Fed. Credit Union*, 738 N.W.2d 40, 45 (S.D. 2007). "The potentially harsh effects of the at-will doctrine have been tempered in South Dakota by the adoption of the public policy exception." *Dahl v. Combined Ins. Co.*, 621 N.W.2d 163, 166 (S.D. 2001) (citations omitted). To prevail on a claim for wrongful termination, the party must show that the "motivation for termination contravenes a clear mandate of public policy." *Id.* The South Dakota Supreme Court has recognized three public policy exceptions to the employment at-will doctrine: (1) an employee's discharge for refusing to commit an unlawful or criminal act; (2) an employee's discharge after whistle blowing that promoted the public good; and (3) termination for filing a worker's compensation claim. *Anderson*, 738 N.W.2d at 45-46.

Whether a termination violates South Dakota's public policy is a question of law. *Niesent v. Homestake Mining Co. of Cal.*, 505 N.W.2d 781, 783 (S.D. 1993). Courts look to public policy declarations in the state constitution,

22

statutes, and judicial decisions. *Id.* After the employee shows that the state's public policy may have been violated, then "the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." *Dahl*, 621 N.W.2d at 168.

Kappenman alleges that she was terminated because she was unwilling to commit unlawful or criminal acts and is a whistle blower who was retaliated against. CCH claims that Kappenman was terminated because she was told to stop contacting her co-workers and she failed to do so, which amounted to insubordination. Docket 43-3 at 6-8. As already discussed under the FCA retaliation analysis, Kappenman has brought forth sufficient factual support to make out a prima facie case that she was terminated because of her whistle blowing. Additionally, Kappenman's whistle blowing promoted the public good because it contravenes South Dakota public policy to terminate an employee who reports fraudulent activity or improper spending of the federal fisc, and that activity plays a valuable role in society. *See Dahl*, 621 N.W.2d at 167 ("Indeed, there is no public policy that can be said to be more basic or necessary than the enforcement of the state's criminal code or the protection of the life and property of its citizens."). There is a genuine dispute of material fact whether Kappenman was discharged because she refused to commit an unlawful act or because she was a whistle blower.

23

CCH argues that there is no connection between Kappenman reporting the alleged false claims and her eventual discharge. CCH states that Kappenman was fired because she disregarded a directive from a supervisor and was insubordinate. Kappenman, however, has made a prima facie showing that the timing of her discharge coupled with CCH's treatment of her following her trip to New Jersey is enough to show a causal connection between her whistle blowing and her termination. Under South Dakota law, Kappenman does not have to show that CCH's retaliatory motive was the sole reason for her termination. *See Lord v. Hy-Vee Food Stores*, 720 N.W.2d 443, 450-53 (S.D. 2006) ("In defining that causal link courts have not required a claimant to prove that the protected activity was the sole cause of the adverse employment action.").

Moreover, CCH argues that Kappenman did not sustain injury as a result of her termination and because she has no damages this claim cannot proceed.[4] Kappenman has shown that she was out of work for approximately a month, which amounts to a loss in pay and is enough to preclude summary judgment on this claim. The court finds that viewing the facts in the light most

---

[4] Kappenman began working at Asera Care about a month after she was discharged from CCH. Docket 42 at 5-6. Kappenman began looking for alternative jobs in December of 2008 prior to her termination. *Id.* at 5. Asera paid Kappenman a significantly higher salary than she received at CCH. *Id.* at 6.

24

favorable to Kappenman, she states a cause of action for wrongful discharge in violation of public policy.

### B.    Intentional Infliction of Emotional Distress

To make a prima facie showing of intentional infliction of emotional distress, the litigant must prove: "(1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause the plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's distress; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct." *Anderson*, 738 N.W.2d at 51-52. The South Dakota Supreme Court has said that this conduct must be so outrageous in character and "so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Richardson v. E. River Elec. Power Coop., Inc.*, 531 N.W.2d 23, 27 (S.D. 1995) (citation omitted). "Although physical symptoms are not required to prove severe emotional distress in South Dakota, the plaintiff must provide some type of evidence adequate to prove that severe emotional distress does, in fact, exist." *Christians v. Christians*, 637 N.W.2d 377, 389 (S.D. 2001) (citation omitted).

Kappenman claims that an illegal termination can amount to extreme and outrageous conduct. While Kappenman notes the impropriety of the reasoning behind her termination, that is not the appropriate conduct to

consider for the first factor of an intentional infliction of emotional distress analysis. The appropriate conduct to consider is the employer's conduct that occurred during the actual termination. *See Richardson*, 531 N.W.2d at 29 n.2 ("Neither [the employee]'s employment history, nor [the employer]'s thoughts or intent (the second element of an intentional infliction of emotional distress claim), factor into an examination of the *actual conduct* which must be extreme and outrageous.").

In this case, there is no evidence that during the termination voices were raised, that Kappenman was not given the opportunity to respond, or that the environment was hostile. *See id.* at 29. Although a termination is usually an upsetting occurrence, Kappenman has not shown that CCH's conduct rises to the level of being extreme or outrageous. *Id.* ("We recognize that a person whose employment is terminated by discharge will likely be upset, but we find nothing in the conduct of the defendants that rises to the level of extreme or outrageous conduct."). Additionally, Kappenman has not identified any facts to show that CCH intended to cause her extreme emotional distress or that she suffered an extreme disabling response to CCH's conduct. For these reasons, summary judgment is granted to CCH on this issue.

### C.   Defamation

Kappenman alleges that she was defamed when CCH sent a letter to her new employer stating that Kappenman was defaming CCH and she had

26

harassed CCH employees. CCH argues that the defamation claim cannot survive summary judgment because Kappenman cannot prove that she was injured by the statements, any communication was privileged, and CCH had reasonable grounds to believe the communications were valid. Docket 41 at 20.

"A statement is actionable if it implies a false assertion of objective fact." *Paint Brush Corp. v. Neu*, 599 N.W.2d 384, 397 (S.D. 1999). Under South Dakota law, defamation is either libel or slander. SDCL 20-11-2. Libel is "a false and unprivileged publication by writing . . . or other fixed representation" that "exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." SDCL 20-11-5. There is no defamation if the communication is made without malice or is privileged. *Paint Brush Corp.*, 599 N.W.2d at 397-98. A privileged communication is made "without malice, to a person interested therein, by one who is also interested or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent[.]" SDCL 20-11-5(3). Malice cannot be inferred and specifically must be proven. *Paint Brush Corp.*, 599 N.W.2d at 398. "The real test of whether a party's conduct is reckless so as to constitute actual malice is whether he in fact entertained serious doubts as to the truth of his publications." *Id.*

27

The alleged false assertions of objective fact that are at issue were sent in a letter from CCH's attorney to Kappenman and her new employer. The letter is properly labeled a cease and desist letter. Docket 43-6. In the letter, CCH states that it believes Kappenman was harassing CCH employees, she was defaming CCH in nursing homes and within the healthcare community, and Kappenman was supposed to cease these activities or face legal action. *Id.* First, there is a dispute of material fact as to whether these statements are false assertions of objective fact. There is also a dispute as to whether CCH's statements were privileged or if CCH acted with malice. And the South Dakota Supreme Court has noted that an "issue of truth or falsity of a statement" as well as the alleged tortfeasor's state of mind "is for the trier of fact." *Schaffer v. Spicer*, 215 N.W.2d 134, 41 (S.D. 1974).

CCH claims that Kappenman cannot prove that the letter had a negative impact upon her occupation because she was promoted and received a salary increase even after her supervisor received the allegedly libelous letter. Docket 41 at 20. This logic falls short, though, because the central damage that defamation claims seek to prevent is damage to one's reputation, which generally is not easily measured. *See Gregory's, Inc. v. Haan*, 545 N.W.2d 488, 493 n.2 (S.D. 1996) ("The action for defamation is to protect the personal reputation of the injured party[.]") (citing Restatement (Second) of Torts § 623A cmt. G (1977)). Kappenman has brought forth sufficient factual support to

28

preclude summary judgment on this claim and the remaining issues are questions of fact to be determined by a jury.

### D.    Tortious Interference with a Business Relationship

CCH asserts that Kappenman cannot establish that the cease and desist letter damaged her relationship with Asera, and Kappenman has not identified any damages from the alleged interference. Kappenman did not respond to CCH's arguments or come forward with any factual support to establish a genuine issue of material fact; therefore, summary judgment is granted to CCH on this claim.

### E.    Punitive Damages

CCH argues that Kappenman cannot receive punitive damages because her underlying actions fail and punitive damages cannot stand without an underlying tort claim. Kappenman argues that she has shown a number of claims for which she has proven she is entitled to punitive damages, and the jury should be able to award damages as it sees fit.

The South Dakota Supreme Court has recognized that a retaliatory discharge actions lies in tort, not contract, law, which means punitive damages are available in this case. *See Tiede v. CorTrust Bank, N.A.*, 748 N.W.2d 748, 752 (S.D. 2008). There must be a showing that the defendant acted with malice to support a claim for punitive damages, and malice can be presumed or actual. *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752,

761 (S.D. 1994). "Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Id.* Presumed malice is demonstrated by showing a "disregard for the rights of others." *Id.* " 'Malice as used in reference to exemplary damages is not simply the doing of an unlawful or injurious act, it implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations.' " *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991) (citation omitted).

Kappenman has established that there is a dispute as to whether she was terminated because of her whistle blowing activities. Viewing the facts in Kappenman's favor, the court finds that CCH's termination of Kappenman for whistle blowing could have been done with an intention to hurt Kappenman or in disregard of her rights. Moreover, CCH did not bring forth any facts to support its burden on summary judgment that it did not act maliciously. Instead, CCH concludes that because Kappenman cannot prove her underlying tort causes of action, her punitive damages claim is not supported and also fails as a matter of law.

Whether CCH acted maliciously in regard to Kappenman's underlying employment action is a genuine dispute of material facts such that summary judgment is inappropriate. *See Smoot v. Am. Tissue Servs. Found. Ltd.*, No. Civ. 06-4084, 2009 WL 438078, *7 (D.S.D. Feb. 20, 2009) ("Evidence has been

produced in this case to show that Plaintiff and other . . . employees may have been wrongfully terminated for reporting health and safety concerns to the FDA[,]" which was sufficient for punitive damages claims to survive summary judgment). Because there is sufficient evidence of actual or presumed malice by CCH, the punitive damages claim survives summary judgment.

## CONCLUSION

Kappenman has brought forward sufficient evidence to show there is a genuine dispute in material fact as to whether CCH knowingly made a false statement that is material to a false or fraudulent claim or knowingly submitted a false or fraudulent claim to the government. Kappenman also established a prima facie case for retaliation under the FCA and state-law claims of wrongful discharge, defamation, and punitive damages such that summary judgment is precluded. Kappenman failed to show that there was a genuine dispute in material fact as to her allegations of intentional infliction of emotional distress, tortious interference with a business relationship, and conspiracy under the FCA; therefore, those claims are dismissed. It is

ORDERED that CCH's motion for summary judgment (Docket 40) on Kappenman's claims under §§ 3729(a)(1) & 3729(a)(1)(B) of the FCA is denied.

IT IS FURTHER ORDERED that CCH's motion for summary judgment (Docket 40) on Kappenman's claims of wrongful discharge, defamation, and punitive damages is denied.

IT IS FURTHER ORDERED that CCH's motion for summary judgment (Docket 40) on Kappenman's claims for intentional infliction of emotional distress, tortious interference with a business relationship, and conspiracy under § 3729(a)(3) of the FCA is granted.

Dated February 23, 2012.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE